FILED
2026 Aug-31 PM 01:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| TIFFANY HARRIS, on behalf of herself and others similarly situated, | : | CIVIL ACTION FILE NO. 26-cv-332 |
| Plaintiff, | : | |
| v. | : | |
| CORDOBA LEGAL GROUP PLLC, | : | |
| Defendant. | : | |

# PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL ARBITRATION

## Introduction

Defendant Cordoba Legal Group PLLC asks the Court to compel Plaintiff Tiffany Harris to arbitrate based on an alleged interaction with a third-party website that Harris unequivocally denies ever occurred. According to Cordoba, Harris visited debtsrelief.shop on November 10, 2025, entered her personal and financial information, checked a consent box, clicked "I Agree," and thereby accepted Terms and Conditions containing an arbitration provision. Harris has now submitted sworn testimony directly contradicting that account.

She had never heard of Debts Relief before the calls at issue, did not know debtsrelief.shop existed, did not visit the website, did not enter information into it,

did not click "I Agree," and did not assent to its Terms and Conditions. *See* Harris Decl. ¶¶ 3–7, 15.

The surrounding evidence reinforces Harris's testimony. The alleged lead record contains an email address that was not hers and debt information she says was inaccurate. Harris Decl. ¶¶ 8–11. Harris's own browser history contains no record of a visit to the website. *Id.* ¶ 7. And Cordoba's later records show a materially different sequence of events: after the alleged November 10 website submission, third-party representatives actually spoke with Harris, obtained information from her, pulled her credit, learned her actual debt amount, obtained her correct email address, and later guided her through a separate electronic contract process. Those later interactions do not establish that Harris independently visited debtsrelief.shop days earlier and accepted an arbitration provision.

Cordoba's Motion also comes after months of litigating this case in federal court. Harris filed this action on February 26, 2026. ECF No. 1. Cordoba answered on April 10, 2026. ECF No. 9. The parties participated in the Rule 26(f) process and filed their planning report on May 1, 2026. ECF No. 12. On May 12, 2026, the Court entered a Scheduling Order placing the case on an ordinary litigation track, including a December 1, 2026 discovery deadline and a May 15, 2027 dispositive-motion deadline. ECF No. 15. Cordoba thereafter participated in discovery, served

substantive responses concerning its consent defense, supplemented those responses, and produced records concerning Harris and the calls.

By July 2026, Cordoba was not merely attempting to determine whether some unidentified consent record existed. It had developed and asserted the specific factual contention that Harris personally visited debtsrelief.shop on November 10, 2025, entered her information, and accepted a consent disclosure. Cordoba stated in its discovery responses that the "primary issue of this case" was Harris's consent and revocation, and it expressly described itself as continuing its "discovery in this action" and "preparation for trial of this action." Yet it did not tell Harris that the same alleged transaction supposedly required arbitration until August 6, 2026. It did not file its evidentiary materials concerning arbitration until August 19, ECF Nos. 18–19, and did not actually move to compel arbitration until August 20, 2026. ECF No. 20.

The Motion should be denied for two independent reasons.

First, Cordoba's course of conduct before invoking arbitration supports waiver. Cordoba developed the alleged consent transaction as a litigation defense, participated in discovery concerning it, contemplated trial in this Court, and only later asserted that the same transaction deprived this Court of the proper forum.

Second, and independently, Harris directly disputes that any arbitration agreement was ever formed. Cordoba has an electronic lead record that it attributes

to Harris; Harris swears that she never created it, and several features of Cordoba's own evidence reinforce her denial. At minimum, the making of the alleged arbitration agreement is genuinely disputed.

## **Background**

Harris filed this putative class action on February 26, 2026, alleging violations of the Telephone Consumer Protection Act arising from unsolicited telemarketing calls promoting Cordoba's services. ECF No. 1. The Complaint alleges that, before receiving the calls, Harris had not sought out or solicited information concerning Cordoba's goods or services. ECF No. 1 ¶ 17. Her telephone number ending in 1539 is used for personal purposes and had been registered on the National Do Not Call Registry since August 28, 2024. *Id.* ¶¶ 18–20.

Harris alleged that she received at least three telemarketing calls associated with Cordoba in November 2025. ECF No. 1 ¶¶ 21–22. The calls used a prerecorded or artificial voice and asked, in substance, how much money Harris owed the IRS before instructing her to remain on the line for transfer to a live representative. *Id.* ¶¶ 23–26. Following the November 17 interaction, Harris received retention papers from Javier Lara at a cordobalegal.com email address. *Id.* ¶¶ 27–28. Harris alleged that she had not provided Cordoba prior express consent for the calls and had no established business relationship with Cordoba before receiving them. *Id.* ¶¶ 29–30.

Cordoba was served on March 20, 2026 and answered the Complaint on April 10, 2026. ECF Nos. 8–9. The Court thereafter ordered compliance with Rule 26(f), ECF No. 11, and the parties filed their Rule 26(f) Planning Report on May 1, 2026. ECF No. 12. After the case was reassigned to Judge Haikala, ECF No. 13, the Court entered its Scheduling Order on May 12, 2026. ECF No. 15. That Order established a December 1, 2026 discovery deadline, a May 15, 2027 dispositive-motion deadline, and a November 16, 2026 status conference.

The parties proceeded with discovery. Cordoba identified a chain through which the purported lead reached it. It supplemented its discovery responses to state that "DRM Marketing, LLC's vendor received Plaintiff's consent opt-in and called Plaintiff." Cordoba further asserted that a third-party marketing company contacted Harris on November 13 and November 17, 2025 after the alleged consent was obtained.

On July 10, 2026, Cordoba served Supplemental and Amended Responses to Plaintiff's First Set of Interrogatories and Requests for Production and produced records Bates-stamped COR0003 through COR0009. Those materials included call audits, recordings, and records concerning the website and alleged consent. Plaintiff thereafter continued seeking discovery concerning, among other things, DRM Marketing, the alleged consent, the transmission of Harris's lead, Cordoba's vendor relationships, and the underlying CRM, database, metadata, and consent records.

Plaintiff also requested dates for the deposition of Alfredo Cordoba, who verified Defendant's discovery responses, and served a Second Set of Discovery.

On July 28, 2026, Plaintiff moved to extend the deadline to amend pleadings and join parties. ECF No. 16. The Court granted the motion the next day and extended that deadline through September 29, 2026. ECF No. 17. The case thus continued proceeding under the Court's scheduling order.

It was not until August 6, 2026 that defense counsel advised Plaintiff that Cordoba intended to seek arbitration. Counsel stated that Cordoba "will be filing a motion to compel arbitration and a motion to stay discovery" and requested Plaintiff's assent to the proposed discovery stay.

Harris denies the central factual premise upon which that Motion depends. Her sworn declaration states that she had never heard of Debts Relief before the calls, did not know debtsrelief.shop existed, did not visit the website, did not accept its Terms and Conditions, and did not check a consent box or click "I Agree." Harris Decl. ¶¶ 3–7, 15. She further identifies inaccuracies in the information supposedly submitted by her and explains that her later interactions with debt-relief representatives occurred through telephone calls and a separate electronic-contract process. *Id.* ¶¶ 8–14.

## Argument

**I. This dispute is for the Court to resolve.**

In evaluating a motion to compel arbitration in a TCPA case, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq*., governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue").

Where a party contests either or both matters, *the court* must resolve the disagreement.") (emphasis in original); *Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005) ("[T]he question 'whether the parties have a valid arbitration agreement at all' is for the court, not the arbitrator, to decide." (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003))). "After all, parties cannot delegate disputes over whether an agreement even exists between them (for the very reason that there is a dispute about whether an agreement existed in the first place)." *Newman v. Plains All Am. Pipeline, L.P.,* 23 F.4th 393, 398 (5th Cir. 2022); *see also Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1118 (11th Cir. 2020) ("However, the Act requires a court to send threshold questions of arbitrability to an arbitrator only when the parties have agreed to so do. Because there was no contract, the aggrieved

distributors have not agreed to anything with the top distributors"); *Reiterman v. Abid*, 26 F. 4th 1226, 1231 (11th Cir. 2022) ("Courts must decide any challenges to the existence of the contract or to the validity of the arbitration clause standing alone before compelling arbitration.").

## II. Cordoba Cannot Establish an Undisputed Agreement to Arbitrate Because Harris Denies Ever Visiting Debtsrelief.shop or Agreeing to Its Terms.

Cordoba's Motion ultimately depends on one factual proposition: Tiffany Harris was the individual who visited debtsrelief.shop on November 10, 2025 and performed the acts that Cordoba characterizes as assent.

Harris says she was not. *See* Declaration of Tiffany Harris.

That dispute precedes every argument Cordoba makes concerning the language, placement, or enforceability of the website's arbitration provision. Before the Court can determine what legal consequences followed from clicking "I Agree," there must first be an undisputed basis to conclude that Harris was the person who clicked it.

There is not.

"Simply put, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chamlee v. Jonesboro Nursing & Rehab. Ctr., LLC*, No. 1:18-cv-05899-ELR, 2019 U.S. Dist. LEXIS 199524, 2019 WL 6042273, at *1 (N.D. Ga. Aug. 14, 2019) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854

(11th Cir. 1992)). When deciding whether the parties agreed to arbitrate a certain matter, courts "should apply ordinary state-law principles that govern formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Like any contractual relationship, there must be a meeting of the minds between the parties. It is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract. Furthermore, it is a tenent of contract law that a third-party cannot be bound by a contract to which it was not a party." *Norfolk Southern Ry. v. Groves*, 586 F.3d 1273, 1275 (11th Cir. 2009).

The Court's decision in *Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019), is instructive. There, a Telephone Consumer Protection Act ("TCPA") defendant sought to compel the plaintiff's claims to arbitration by contending, like Defendant does here, that the plaintiff agreed to an arbitration provision as a result of his visits to the defendant's website. *Id*. at *1. In finding no agreement to arbitrate existed, the court explained:

> But, Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. Hobbs Decl. ¶¶ 12, 20, ECF No. 20-1. According to Plaintiff, at 3:57 p.m. on August 29, 2018, Plaintiff was driving from a job at the Atlanta Zoo in southeast Atlanta, Georgia to Columbus, Georgia (southwest of Atlanta) and thus could not have been in Norcross, Georgia (northeast of Atlanta). *Id.* ¶¶ 14-17. Plaintiff also presented evidence that he does not own a device that uses the Windows 7 operating system; he uses his cellular telephone for internet access. *Id.* ¶ 18. Finally, Plaintiff stated

> that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." *Id.* ¶¶ 11-12. From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit." So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration (ECF No. 14) is denied.

*Id*. at *2. Indeed, another federal Court in the Eleventh Circuit denied outright even the ability to have an arbitration trial in *Conrad v. Camping World Holdings Inc.*, No. 4:24-cv-171-CLM, 2025 U.S. Dist. LEXIS 6373 (N.D. Ala. Jan. 9, 2025):

> Did Conrad or someone else opt in to CWH's recurring text service on January 20, 2022? And "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an arbitration agreement has been made." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (citing *Dasher v. RBC Bank*, 745 F.3d 1111, 1116 (11th Cir. 2014)). The court's decision as to whether an arbitration agreement exists is simply a matter of contract. *Bazemore*, 827 F.3d at 1329.
>
> Under Alabama law, "[w]hen a competent adult...signs a contract, [they] will be held to be on notice of all the provisions contained in that contract and will be bound thereby." *Ex Parte Brown*, 26 So. 3d 1222, 1227 (Ala. 2009). But [*5] the flip side is also true: if the adult did not sign or otherwise enter the contract, he cannot be bound by its terms.
>
> In his complaint, Conrad pleaded that he started using the -8185 number in September 2023 and placed it on the DNC Registry on September 26, 2023. (Doc. 1-1, ¶¶ 8-11). After CWH filed its motion, which asserted that Conrad opted the -8185 number into the CWH text service in January 2022, Conrad produced an affidavit in which he said it was "impossible for me to have sent a text message from 256-xxx-8185 in January 2022 because that telephone number was not mine at the

time[.]" (Doc. 18-1, ¶ 23). To support his assertion, Conrad produced a screenshot of his wireless account that suggests Conrad was indeed assigned the -8185 number on September 4, 2023:

Rather than produce evidence that suggests Conrad controlled the -8185 number in January 2022 (when someone opted-in to CWH's text service), CWH responded with Lexis and Westlaw search results that suggest the -8185 number belonged to either Norma Atchley or Jacob Blair starting in April 2022 and going through April 2024. (Docs. 19-1, 19-2). Whatever these search results might show or suggest, they provide [*6] no competent evidence that *Conrad* agreed to opt the -8185 number into CWH's text service in January 2022. And without any evidence that could prove Conrad agreed to CWH's arbitration provision as part of the opt-in process, CWH cannot show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service.

Although the FAA allows parties to delegate threshold arbitrability questions to an arbitrator, "where, as here, a challenge [to an arbitration agreement] applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1194 (2024) ("Again, basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute. So too here. 'If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court *must* consider the challenge before ordering compliance with that [arbitration] agreement.'").

**A. Harris Unequivocally Denies the Alleged Website Transaction**

Cordoba frames its Motion as a conventional online-assent case. It asserts that Harris entered information into Debts Relief's website, checked a consent box and clicked "I Agree." From there, Cordoba argues that she accepted the site's Terms and Conditions. But Harris does not dispute merely the legal significance of those acts. She denies performing them altogether.

Before the calls at issue, Harris had never heard of Debts Relief. Harris Decl. ¶ 3. Before this litigation, she did not even know that debtsrelief.shop existed. *Id.* ¶ 4. She did not visit or navigate to that website on November 10, 2025 or at any other time before the calls. *Id.* ¶ 5. She therefore did not agree to its Terms and Conditions or knowingly or intentionally accept an arbitration provision appearing there. *Id.* ¶ 6.

Her position is also consistent with the allegations she made before Cordoba raised arbitration. The Complaint alleges that "[a]t no point" before receiving the telemarketing calls had Harris "sought out or solicited information regarding Defendant's goods and services." ECF No. 1 ¶ 17. It alleges that she did not provide Cordoba with prior consent and had no established business relationship with Cordoba before the calls. *Id.* ¶¶ 29–30.

Cordoba's present theory is the opposite: that Harris affirmatively sought debt-relief assistance online three days before its representatives spoke with her and voluntarily entered the very marketing funnel that resulted in the calls.

The parties therefore dispute a foundational historical fact.

**B. The Alleged Lead Contains an Email Address That Was Not Harris's**

The contents of the alleged lead itself provide further reason not to assume Harris created it.

Harris testifies that the email address reflected in Cordoba's alleged lead information was <u>not hers</u>. Harris Decl. ¶ 8. In November 2025, the email addresses she actually used included trapn.382@gmail.com and Gigi.azul82@gmail.com. *Id.* That discrepancy directly concerns a field Cordoba says Harris personally typed into the website.

Cordoba's theory is not merely that some information associated with Harris entered its systems. Cordoba affirmatively states that Harris herself went to the website and "input her name, phone number, email address" and other information. If Harris herself filled out the form, the presence of an email address that was not hers is significant evidence against that attribution.

The subsequent telephone evidence makes the discrepancy more meaningful. During a later recorded telephone call, Harris specifically asked what email address the caller had on file because that address was not hers. Harris Decl. ¶ 9. She then

provided her actual current email address, trapn.382@gmail.com, during the telephone interaction. *Id.*

The chronology therefore supplies a straightforward alternative explanation for why Cordoba eventually possessed Harris's correct email: Harris gave it to a representative during a later telephone interaction. That does not establish that she previously supplied some other email through debtsrelief.shop.

**C. The Alleged Debt Amount Does Not Match Harris's Actual Financial Information and Other Financial Information Associated With Harris Was Also Inaccurate.**

The alleged website record also attributes financial information to Harris that she says she did not provide and that Cordoba's later records contradict. According to the purported submission, Harris selected a range indicating that she had between $10,000 and $20,000 in credit-card debt.

Harris testifies that she does not believe she had that amount of credit-card debt and explains that she had never possessed credit cards with limits that would have allowed her to accumulate debt in that range. Harris Decl. ¶ 10. That discrepancy is important because Cordoba asks the Court to infer authorship from the fact that data associated with Harris appears in an electronic record. Yet when the data can be compared to information later obtained directly from Harris or her credit report, material parts of it do not match.

The debt range was not the only inaccurate financial information. Harris testifies that other financial information later placed into documents concerning her was also inaccurate, including banking information and amounts attributed to her credit cards. Harris Decl. ¶ 11. Her earlier responses similarly identify banking information and credit-card amounts as inaccurate. Those discrepancies matter because the electronic records Cordoba relies upon are not self-authenticating proof of who supplied each piece of data.

The inaccuracies provide affirmative reason to distinguish those questions.

### D. Harris's Acknowledgment of the Later Events Strengthens the Reliability of Her Denial

Harris's testimony is particularly significant because she does **not** deny documented events indiscriminately.

She acknowledges that she later participated in a debt-related application process. She acknowledges receiving documents. She explains the DocuSign process. She distinguishes what she actually did from what Cordoba now says she did.

What she denies is specific: she did not independently visit debtsrelief.shop and did not assent to the Terms and Conditions on that website.

That narrow denial is consistent with the documentary record.

Cordoba's call audits corroborate that representatives later interacted with her and guided her through a separate contract process. Harris does not dispute that. Her

denial instead concerns a different event for which Cordoba relies upon an electronically generated lead record containing material inaccuracies. This is therefore not a situation in which Harris simply denies every interaction in the face of contrary records. She separates the events she knows occurred from the one Cordoba attributes to her that she says did not.

### E. Harris Did Not Authorize Anyone Else to Submit the Form or Consent on Her Behalf

Nor can Cordoba cure the attribution problem by suggesting that another person may have completed the website form with Harris's authority. Harris expressly testifies that she did not authorize anyone else to submit her information to Debts Relief. Harris Decl. ¶ 12. She did not authorize anyone else to consent on her behalf to receive calls from Cordoba. *Id.* ¶ 13. And she did not knowingly provide Cordoba or Debts Relief consent through debtsrelief.shop. *Id.* ¶ 14.

Thus, even if Cordoba's electronic records establish that someone entered Harris's name and telephone number into a website, Harris denies that she did so or authorized anyone else to do so for her.

### F. The Chain of Records Does Not Supply Personal Knowledge That Harris Was the Person Behind the Device.

Cordoba's evidentiary chain further illustrates the attribution problem.

Cordoba did not operate debtsrelief.shop. According to its own discovery responses, the alleged consent originated through a vendor chain involving DRM

Marketing and another vendor. Cordoba stated that "DRM Marketing, LLC's vendor received Plaintiff's consent opt-in," and its Second Set responses state that Cordoba ultimately received the alleged consent through DRM Marketing. Cordoba therefore possesses records telling it that an online submission associated with Harris supposedly occurred. That is different from personal knowledge that Harris was the human being who made it.

Debts Relief's records may record an IP address, timestamp and information entered into a form. But those data points do not themselves observe the person using the device. The central factual inference—that Harris was that person—is precisely what her declaration disputes. Harris, by contrast, has direct personal knowledge concerning her own conduct. She knows whether she had heard of Debts Relief, whether she navigated to its website, whether she entered information into it, and whether she clicked a box accepting its terms. She says she did not. Harris Decl. ¶¶ 3–7, 15.

Cordoba's argument effectively treats the third-party lead record as both the allegation and the proof. The record contains Harris's name and telephone number; therefore, Cordoba reasons, Harris must have created the record. But that inference is exactly what is disputed.

The incorrect email address weakens the inference. Harris Decl. ¶ 8. The questionable debt amount weakens it further. *Id.* ¶ 10. The other inaccurate financial

information does the same. *Id.* ¶ 11. And Cordoba's own later records establish that its representatives subsequently obtained accurate personal and financial information directly from Harris and guided her through a separate electronic transaction.

Thus, the presence of Harris's name and telephone number does not eliminate the attribution dispute. It establishes only that a lead record bearing information associated with her exists.

### G. This Is a Disputed Formation Case, Not Merely a Dispute About the Scope or Meaning of an Existing Agreement

The evidence should therefore be viewed for what it is. Cordoba contends:

- Harris visited debtsrelief.shop;
- Harris entered information into the website;
- Harris checked the consent box;
- Harris clicked "I Agree"; and
- Harris thereby accepted the Terms and Conditions.
-

Harris testifies:

- she had never heard of Debts Relief before the calls;
- she did not know debtsrelief.shop existed;
- she never visited the website;
- she never entered information into it;
- she never checked the consent box;
- she never clicked "I Agree";
- she never agreed to its Terms and Conditions; and
- she never authorized someone else to do those things for her.

Harris Decl. ¶¶ 3–7, 12–15. The surrounding evidence supplies additional support for that denial. The alleged email address was not hers. *Id.* ¶¶ 8–9. The alleged debt

amount does not match the amount Cordoba's representatives later obtained after pulling her actual credit. *Id.* ¶ 10. Other financial information was inaccurate. *Id.* ¶ 11. And Cordoba's own records document a separate subsequent process through which representatives obtained information directly from Harris, sent her documents, and guided her through an electronic contract. Before the Court can enforce the legal terms supposedly associated with that record, it must address whether Harris ever entered into the transaction at all.

## III. Cordoba Waived Any Right to Compel Arbitration by Acting Inconsistently With That Right and Proceeding With This Case in Federal Court.

The FAA does not afford arbitration agreements special protection from ordinary principles of waiver. In *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court rejected arbitration-specific waiver rules, explaining that "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* at 418. Accordingly, courts may not "create arbitration-specific variants of federal procedural rules, like those concerning waiver, based on the FAA's 'policy favoring arbitration.'" *Id.* at 417. If an ordinary rule of waiver would prevent enforcement of a contractual right, the fact that the contractual right involves arbitration does not change the result. *Id.* at 418–19.

The relevant question is whether the party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Id.* at 419. Applying the

Eleventh Circuit's totality-of-the-circumstances approach, a party acts inconsistently with its arbitration right when its conduct demonstrates an election to proceed through litigation rather than arbitration. *Warrington v. Rocky Patel Premium Cigars, Inc.*, No. 22-12575, 2023 U.S. App. LEXIS 3083, at *4 (11th Cir. Feb. 8, 2023). A "key factor" is whether the party "'substantially invoke[d] the litigation machinery prior to demanding arbitration.'" *Id.* (quoting *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018)). And after *Morgan*, Plaintiff need not establish arbitration-specific prejudice resulting from Defendant's conduct. 596 U.S. at 417–19.

Cordoba's conduct here was inconsistent with a timely election to arbitrate. Harris filed this action on February 26, 2026. ECF No. 1. Cordoba was served on March 20 and answered on April 10. ECF Nos. 8–9. It then participated in the Rule 26(f) process, culminating in the parties' May 1 Planning Report. ECF Nos. 11–12. After reassignment to this Court, the Court entered a Scheduling Order establishing a December 1, 2026 discovery deadline and a May 15, 2027 dispositive-motion deadline. ECF Nos. 13, 15. Cordoba proceeded under that schedule rather than seeking arbitration.

More importantly, Cordoba proceeded with discovery into the very factual transaction that it now claims created the arbitration agreement. Cordoba identified consent as the central merits issue, stating in its discovery responses that "[t]he

primary issue of this case will be whether the Plaintiff consented to receive the alleged calls at issue and whether she revoked her consent at any point." Cordoba then developed a detailed factual theory of that consent. It asserted that Harris personally visited debtsrelief.shop on November 10, 2025, from IP address 68.68.235.23, entered her identifying and financial information, and accepted the website's consent disclosure. Cordoba further identified DRM Marketing LLC's vendor as the entity that supposedly "received Plaintiff's consent opt-in and called Plaintiff."

That chronology matters because Cordoba's consent defense and its arbitration defense depend upon the same alleged transaction. Cordoba does not contend that Harris separately entered into an arbitration agreement that it discovered later. Rather, its Motion asserts that Harris entered information into debtsrelief.shop, checked the consent box, and clicked "I Agree," and that this single transaction both authorized the subsequent calls and bound Harris to Terms and Conditions containing an arbitration provision. *See* ECF No. 20. Thus, once Cordoba had developed and affirmatively asserted the factual position that Harris personally completed the November 10 website transaction, it possessed the factual predicate for the arbitration argument it now advances. Yet Cordoba did not then move to compel arbitration.

Cordoba did not announce its intention to compel arbitration until August 6, 2026. By then, more than four months had passed since Cordoba answered the Complaint, the parties had completed the Rule 26(f) process, the Court had entered a Scheduling Order, Cordoba had participated in discovery, Cordoba had served supplemental discovery responses, and—most importantly—Cordoba had already developed the specific website transaction upon which its arbitration theory depends.

The totality of those circumstances supports waiver. This is not a case in which a defendant discovered an arbitration agreement, promptly notified its opponent, and immediately sought to enforce it. Cordoba instead proceeded through the ordinary federal litigation process, developed the November 10 website transaction as its consent defense, supplemented its discovery concerning that transaction, produced supporting materials, and expressly represented that it was continuing discovery and preparing the case for trial. Only afterward did it invoke an arbitration provision supposedly contained in the very same transaction.

That sequence is inconsistent with a timely election to arbitrate. As the Eleventh Circuit has explained, the waiver doctrine prevents a litigant from proceeding through the judicial process and then changing course by invoking arbitration. *Gutierrez*, 889 F.3d at 1236. And *Morgan* forecloses giving Cordoba an arbitration-specific presumption or heightened waiver standard that would excuse

conduct that otherwise demonstrates relinquishment of a contractual right. 596 U.S. at 417–19.

Accordingly, even if Cordoba could otherwise establish that Harris entered into the alleged arbitration agreement—which she did not—Cordoba waived any right to compel arbitration by acting inconsistently with that right before filing its Motion.

## Conclusion

Cordoba's Motion fails at the threshold. The arbitration provision upon which it relies arises from an alleged November 10, 2025 website transaction that Harris unequivocally denies ever occurred. Harris testifies under penalty of perjury that she had never heard of Debts Relief, did not know debtsrelief.shop existed, did not visit the website, did not enter information into it, did not check a consent box, did not click "I Agree," and did not accept its Terms and Conditions. Harris Decl. ¶¶ 3–7, 15. The surrounding evidence—including the incorrect email address, inaccurate financial information, and the later representative-guided contract process—further supports her denial. At minimum, Cordoba cannot establish an undisputed agreement to arbitrate on this record.

Cordoba also did not timely invoke whatever arbitration right it now claims. It proceeded with this action, participated in the Rule 26(f) process and discovery, developed the alleged November 10 transaction as its consent defense, supplemented

its responses concerning that transaction, produced supporting evidence, and expressly represented that it was continuing discovery and preparing this action for trial. Only later did it contend that the same alleged transaction required arbitration and that this Court was not the proper forum.

For these reasons, Plaintiff respectfully requests that the Court deny Defendant Cordoba Legal Group PLLC's Motion to Compel Arbitration and Stay Proceedings, ECF No. 20. Alternatively, because Harris's sworn testimony at minimum creates a genuine dispute concerning whether she ever entered into the alleged agreement, Plaintiff requests that the Court proceed pursuant to 9 U.S.C. § 4 to resolve the making of the purported arbitration agreement.

Date: August 31, 2026

*/s/ Anthony I. Paronich*

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com

*Counsel for Plaintiff and the proposed class*